**Jackie Russell KEETER, Appellant,**

v.

**The STATE of Texas.**

**No. 1057–01.**

Court of Criminal Appeals of Texas.

May 1, 2002.

As Corrected May 6, 2002.

---

Sandy S. Gately, Gatesville, for Appellant.

Jeffrey L. Van Horn, First Asst. St. Atty., Matthew Paul, State's Atty., Austin, for State

## OPINION

KELLER, P.J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY, and COCHRAN, JJ., joined.

We granted the State's petition to determine whether the Court of Appeals erred in failing to give proper deference to the trial court's ruling. We will reverse.

## A. BACKGROUND

### 1. Trial

In May 1998, appellant lived with Eva and her eight-year-old daughter, J.K. On May 21st, the girl's father (Travis) and his fiancee (Rhonda) arrived unannounced and asked that the child be permitted to come to their home for a summer visit. Eva was not home at the time, but appellant allowed Travis and Rhonda to take J.K. out to eat. At the restaurant, J.K. told Rhonda that appellant had been molesting her and had molested her the day before. As a result of this outcry, Children's Protective Services (CPS) and the sheriff's department were called, and ultimately, appellant was indicted for indecency with a child.

At trial, J.K. testified that appellant had been molesting her a long time, "almost every day," although she did not remember when it started. She said, among other things, that appellant "put his private into my private," but she also said that she never saw his private parts. J.K. further testified that these incidents usually occurred during the afternoon, that she screamed during the incidents because they were painful, that appellant warned her not to tell Eva and J.K obeyed because she was afraid of him, and that the last incident occurred in the morning the day before Travis and Rhonda arrived.

Rhonda testified that she did not know J.K until that visit. Rhonda described the outcry statement at the restaurant. Sheriff's Investigator Buster testified that he interviewed Rhonda and J.K. on May 21st, but he did not describe the contents of the interview. During cross-examination he admitted that J.K. did not recognize male genitalia.

The defense called the child's mother (Eva), her babysitter (Vennie), and appellant's father (Jack). Eva testified that May 20th was the last day of school, that J.K. had a half-day of school in the morning, and that she took J.K. to a party at a playmate's house in the afternoon. She further testified that appellant was home that day, sick in bed. Eva described her house as having two bedrooms, one occupied by Eva and appellant, and the other occupied by appellant's father. Vennie and four children slept in the living room. Eva also testified that appellant worked from 6:00 a.m. to sometimes 6:00 to 8:00 p.m. and had been working those hours for about a year. Finally, Eva testified that J.K. and appellant got along well, that J.K. was not afraid of appellant, that Eva and J.K. got along well, and that J.K. never mentioned any problems concerning appellant.

Vennie confirmed that J.K. was in school the morning of the 20th and that appellant was home sick. She testified that appellant usually worked until 7:00 or 8:00 p.m. and that he never kept the children, even on weekends. She also testified that J.K. had a good relationship with appellant and was not afraid of him. Finally, Vennie testified that J.K. would have told her about any problems with appellant.

Jack testified that J.K. went to school the morning of the 20th and then went to a party at a friend's. He confirmed that appellant was home, sick. He stated that J.K. confided in him about her problems and that she was not afraid of appellant. Finally, he testified that appellant worked

from 6:00 a.m. to 6:00 p.m., five to six days per week.

A jury convicted appellant and sentenced him to life imprisonment.[1]

## 2. Motion for New Trial

Shortly after trial, the child recanted. A motion for new trial was filed and the trial court conducted a hearing about the recantation. At the hearing, Eva testified that Travis brought J.K back to her because "he was tired of her lying." When Eva came home from work the day J.K. arrived, J.K. asked to talk to her. J.K told Eva, "I lied.... I wanted to go stay with daddy and you wouldn't let me." On cross-examination, Eva denied telling J.K. that Eva could not make it financially without appellant.

On direct examination, Travis testified that he had told the prosecutor three or four months before trial, in a cell phone call, that he did not believe J.K. On cross-examination, however, he testified that he had told the prosecutor earlier that he did believe J.K. Through subsequent questioning by the prosecutor, Travis admitted that he had told the prosecutor in January, a month before trial, that he believed J.K.'s story. Travis then maintained that the cell phone call must have occurred later than he thought. Travis also testified that J.K. accused Jack during trial of making some threatening comments to J.K., and he testified that Jack harassed him—trying to get Travis to pressure J.K. into changing her story. And he testified that J.K. was not given any notice that he was coming to visit her. On redirect, Tra-

vis testified that, earlier in 1998, he had written a letter to Eva asking her to allow him to take J.K. for the summer.

Rhonda testified that she never believed J.K.'s accusations: she "kept changing her story one too many times.... She will say he did it, then if we asked—talked about it, she'd say he didn't do it or I never said that. She just wasn't consistent with her story." Rhonda admitted that she had a poor relationship with J.K.: "I was not going to tolerate her lying, being dishonest, being disrespectful to other people.... I told [Travis] he either gets her under control to where she minds and listens, not throw fits, and hits me, be mean to me or she can go back home to her mother." When asked about her experience with J.K., Rhonda indicated that J.K. "lies a lot."

J.K. testified that she made up the accusations because she wanted to live with her father. She said that her mother told her she could not go to her father's for the summer, and she said that the idea for her story came from things her eleven-year-old best friend had told her. J.K. denied telling Investigator Buster that she changed her story because Eva said she could not make a living without appellant. J.K. claimed she told Buster "that my mom said that she needed help and I had to help her out," with, for example, washing dishes or cleaning her room. J.K also denied telling Buster that her three-year-old stepsister suggested the plan about accusing appellant of something. J.K. claimed her stepsister told her that she "could go with [Travis] if something happened." J.K. did admit that Jack had

---

1. At the punishment phase, the State introduced evidence of several extraneous offenses committed by appellant: molesting his sister, exposing his genitals to a female under age seventeen, having sexual intercourse with another female under age seventeen, and possessing a firearm as a felon. We express no opinion on whether a trial court may consider punishment phase evidence in connection with determining the credibility of a recantation on a motion for new trial. We will address the propriety of the trial court's ruling without considering this evidence.

threatened at trial to take her father away and was mean to her until after she changed her story.

Investigator Buster and CPS worker Johnson testified that they jointly conducted an interview with J.K. prior to the hearing on the motion for new trial. According to both of them, J.K. said: (1) that she changed her story because Eva was having a hard time making a living without appellant and she missed him, and (2) her three-year-old stepsister suggested to her the plan to accuse appellant.

In a letter order, the trial court denied the motion for new trial and indicated that he did not believe the recantation testimony:

> I don't find the new testimony that recants the trial testimony to be credible. To do so would require me to believe that this young child made up her testimony because her (younger!!!) sister told her she would have to make something up about the defendant so she could get to go and spend the summer with her dad, when she did not previously know her dad was coming and when she had not seen him in two years.

### 3. Court of Appeals Opinion

Relying on past precedent, the Court of Appeals set forth a four part test for granting a new trial based upon newly-discovered evidence:

(1) the newly-discovered evidence was unknown to the movant at the time of trial;

(2) the movant's failure to discover the evidence was not due to his want of diligence;

(3) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

(4) the evidence is probably true and would probably bring about a different result in another trial.[2]

According to the Court of Appeals, a recantation is considered to be "probably true" unless "the trial court finds the recantation to not be credible based on the trial evidence and the evidence at a hearing on the motion [for new trial]."[3]

After analyzing several cases, the Court of Appeals concluded that the trial court abused its discretion in finding that the recantation was not credible.[4] The court first found that the trial court had misrepresented the facts.[5] Although the trial court had characterized the father's visit as "unexpected," the Court of Appeals observed that Travis had previously written Eva about having J.K. visit, that J.K. discussed the matter with Eva, and that Eva said "no."[6] The Court of Appeals also disbelieved the evidence that J.K. attributed the idea of accusing appellant to her three-year-old stepsister:

> As for whose idea it was to accuse Keeter of something, J.K. testified she got ideas from listening to her eleven-year-old friend, E., who had witnessed first-hand the physical abuse of her mother. Investigator Buster and the CPS worker attempted to contradict that, and claimed J.K. told them during an interview at her school that J.K.'s three-year-old stepsister came up with the suggestion to accuse Keeter of something. However, Buster admitted J.K. said something about an older girl telling J.K. "what grown people do or some-

---

**2.** *Keeter v. State,* 43 S.W.3d 667, 673–674 (Tex.App.-Waco 2001, pet. granted).

**3.** *Id.* at 674.

**4.** *See Id.* at 674–676.

**5.** *Id.* at 675.

**6.** *Id.*

thing to that effect." J.K. also denied she got the idea from her stepsister. All her stepsister said was she "could go with [Travis] if something happened."[7]

The Court of Appeals also refused to consider the testimony from Investigator Buster and the CPS worker that J.K. recanted because her mother told her she could not make it without appellant.[8] In a footnote, the court gave two reasons for refusing to consider this evidence: (1) the trial judge did not specifically refer to this evidence in his reasons for not believing J.K., and (2) J.K. specifically denied making this statement.[9]

### 4. The State's Argument

The State contends that the Court of Appeals erred in second-guessing the trial court's evaluation of the testimony. Relying upon *State v. Ross*[10] and *Guzman v. State*,[11] the State argues that the trial court is the sole judge of the credibility of the witnesses and could disbelieve any or all of the testimony.

## B. ANALYSIS

### 1. The Four–Part Test

 Motions for new trial based upon newly discovered evidence are controlled by Article 40.001,[12] which provides: "A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." As in all other cases, we interpret this statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning would lead to absurd results that the Legislature could not possibly have contemplated.[13] If the language is ambiguous, or the plain meaning leads to absurd results, then we may look to extratextual factors for guidance in determining the statute's meaning.[14] The statute is ambiguous in that the standard of "materiality" varies according to context;[15] so, an examination of extratextual factors is appropriate.

Before its repeal by the Texas Rules of Appellate Procedure, Article 40.03 set out the grounds for a new trial in criminal cases. One of those grounds was "[w]here new evidence material to the defendant has been discovered since trial."[16] We consistently interpreted that provision as requiring the satisfaction of a four-part test:

(1) the newly discovered evidence was unknown or unavailable to the movant at the time of his trial;

(2) the movant's failure to discover or obtain the evidence was not due to a lack of diligence;

---

7. *Id.*

8. *Id.* at 675 n. 5.

9. Judge Holcomb's dissenting opinion treats the issue here as a factual sufficiency question, and would extend to all fact-bound questions the *Clewis* standard of review. But factual sufficiency of the evidence has not been raised and it is, moreover, not an issue in this case. And, the Court of Appeals never held that the evidence was factually insufficient. We are not bound—constitutionally or otherwise—by a determination that was never made.

10. 32 S.W.3d 853 (Tex.Crim.App.2000).

11. 955 S.W.2d 85 (Tex.Crim.App.1997).

12. All references to articles are to the Texas Code of Criminal Procedure.

13. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991).

14. *Id.*

15. *See*, for example, *United States v. Bagley*, 473 U.S. 667, 680–681, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

16. Article 40.03(6)(Vernon's 1979).

(3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and,

(4) the new evidence is probably true and will probably bring about a different result on another trial.[17]

We characterized the requirement that the evidence be "probably true" as an aspect of the statute's requirement that the new evidence be material.[18]

██ Pursuant to this Court's rulemaking authority, the Article 40.03 provision was repealed and replaced by a rule of appellate procedure providing for a new trial "[w]here new evidence favorable to the accused has been discovered since trial."[19] Pronouncing that the appellate rule contained language "virtually identical" to that found in the statute, we held that the same four-part test applied.[20] With the passage of Article 40.001, the Legislature clarified our rule by explicitly stating a materiality requirement. The only difference between the new statute and our former rule appears to be that the statute expressly requires the discovered evidence to be "material" while the word "material" was omitted from the rule. Nevertheless, because we construed the rule to incorporate the old statute's materiality requirement, no substantive change in the law has been effected. Thus, we interpret the new statute in conformity with our prior caselaw and continue to adhere to the four-part test.

## 2. The Trial Court's Discretion

██ The trial court has discretion to decide whether to grant a new trial based upon newly-discovered evidence, and its ruling will not be reversed absent an abuse of discretion.[21] The trial court's discretion extends to situations in which the newly-discovered evidence is the retraction of a witness's testimony.[22] Likewise, the trial judge determines the credibility of the witnesses and whether the new evidence is probably true.[23]

The State and the Court of Appeals appear to be at odds over the extent of a trial court's discretion to believe or disbelieve a newly discovered recantation. Relying on *Ross* and *Guzman*, the State contends that the trial court has nearly absolute discretion, based upon the trial court's evaluation of credibility and demeanor, to disbelieve the recanted testimony. The Court of Appeals, on the other hand, appears to be implying that a special rule applies to a recantation of incriminating trial testimony, and that the trial court must have some basis in the record for disbelieving a recantation.

The caselaw is unclear in this regard, but it can be construed as supporting the Court of Appeals's idea that some basis in the record must exist to disbelieve a recantation. In *Williams v. State*, we said: "The general rule is that where a witness

**17.** *Ayers v. State,* 606 S.W.2d 936, 941 (Tex. Crim.App.1980); *see also Jones v. State,* 711 S.W.2d 35, 36–37 (Tex.Crim.App.1986); *Boyett v. State,* 692 S.W.2d 512, 516–516 (Tex. Crim.App.1985); *Bolden v. State,* 634 S.W.2d 710, 711–712 (Tex.Crim.App.1982).

**18.** *Boyett,* 692 S.W.2d at 516; *Etter v. State,* 679 S.W.2d 511, 515 (Tex.Crim.App.1984). *See also Jones,* 711 S.W.2d at 37.

**19.** Tex.R.App. P. 30(b)(6)(West 1992).

**20.** *Moore v. State,* 882 S.W.2d 844, 849 (Tex. Crim.App.1994).

**21.** *Jones,* 711 S.W.2d at 36; *Etter,* 679 S.W.2d at 515.

**22.** *Todd v. State,* 601 S.W.2d 718, 721 (Tex. Crim.App.1980); *Dillard v. State,* 550 S.W.2d 45, 52 (Tex.Crim.App.1977); *Wilson v. State,* 445 S.W.2d 213, 216 (Tex.Crim.App.1969).

**23.** *Boyett,* 692 S.W.2d at 517; *Etter,* 679 S.W.2d at 515.

has testified to material inculpatory facts against an accused and after verdict, and before motion for new trial has been acted upon, such witness makes affidavit that he testified falsely, a new trial should be granted." [24] We held that this "general rule" was not without exceptions, depending on the testimony at trial and in the hearing on the motion for new trial.[25] In explaining the "probably true" requirement, we have said, "All this really means is that the whole record presents no good cause to doubt the credibility of the witness whose testimony constitutes the new evidence, 'either by reason of the facts proven at the trial or by the controverting affidavits on the motion, or otherwise.' " [26] In a number of cases, we have evaluated evidence controverting or undermining a recantation in arriving at a holding that the trial court was within its discretion in disbelieving the recantation.[27]

On the other hand, *Ross* established that, under the *Guzman* standard applicable in a motion to suppress setting, the trial court may disbelieve all of a witness's testimony even if that testimony was not controverted.[28] And we have applied to the motion for new trial setting our pronouncements in *Guzman* regarding deference to a trial court's determination of witness credibility.[29] However, *Ross* and

*Guzman* have thus far been applied only in situations in which the trial judge was the factfinder in the first instance: motions to suppress,[30] a potential witness's recantation of out-of-court statements after a defendant's guilty plea,[31] and a question of jury misconduct.[32] In the present case, appellant was tried by a jury on the issue of guilt; the new evidence relates to that issue, on which the trial court was not initially the factfinder-although the trial court became the factfinder at the hearing on the motion for new trial.

However, we need not decide whether that difference is sufficient to distinguish the present case from *Guzman, Ross,* and their progeny. Even under the Court of Appeals's apparent interpretation of our caselaw, the trial court acts within its discretion so long as the record provides some basis for disbelieving the testimony. Such bases include, but are not limited to: evidence that the recanting witness was subject to pressure by family members [33] or to threats from co-conspirators,[34] evidence showing part of the recantation to be false,[35] circumstances showing that the complainant recanted after moving in with family members of the defendant,[36] and where an accomplice recants after being convicted.[37] As will be explained below,

24. 375 S.W.2d 449, 451 (Tex.Crim.App.1964).

25. *Id.*

26. *Jones,* 711 S.W.2d at 37 n. 4.

27. *Todd,* 601 S.W.2d at 721; *Dillard,* 550 S.W.2d at 52; *Williams,* 375 S.W.2d at 450–452.

28. 32 S.W.3d at 855.

29. *Kober v. State,* 988 S.W.2d 230, 233 (Tex. Crim.App.1999); *Quinn v. State,* 958 S.W.2d 395, 401–402 (Tex.Crim.App.1997).

30. *See Ross* and *Guzman,* generally.

31. *Kober,* 988 S.W.2d at 233.

32. *Quinn,* 958 S.W.2d at 402.

33. *Todd,* 601 S.W.2d at 721.

34. *Dillard,* 550 S.W.2d at 52.

35. *Williams,* 375 S.W.2d at 451–452.

36. *Id.* at 452.

37. *Drew v. State,* 743 S.W.2d 207, 228–229 (Tex.Crim.App.1987)("It is not unusual for one of two convicted accomplices to assume the entire fault and thus exculpate his codefendant by the filing of a recanting affidavit or

there were a number of bases in the record for the trial court to disbelieve the recanted testimony.[38]

### 3. The Present Case

■ First, the circumstances of the recantation cast doubt on its validity. As in *Williams*, the complainant here recanted only after she moved in with persons friendly to the defendant; in this case, she recanted after returning to live with her mother, with whom appellant had formerly resided.

Second, there was evidence that appellant's father pressured J.K. into recanting her allegations. There was evidence that Jack threatened J.K. during trial and that he was mean to J.K. before she recanted and nice to her after she recanted.

Third, there is evidence that J.K. gave a non-credible story about how she formed the idea to accuse appellant—that the idea was suggested by her three-year-old stepsister. Although the trial court found J.K. to lack credibility for this very reason, the Court of Appeals refused to consider this evidence because J.K. denied attributing the idea to her younger stepsister and because Investigator Buster admitted that J.K. made a comment regarding an older friend. But even under the Court of Appeals's interpretive gloss of our past precedents, it is not up to the appellate court to decide which evidence to believe. Obviously, the trial court chose to believe the investigator and the CPS worker and chose to disbelieve the child's denials.

Finally, there was testimony that J.K. recanted because her mother needed appellant financially and emotionally. The Court of Appeals's only reason for refusing to consider this evidence is that the trial judge did not refer to it in his findings. The more probable conclusion from the record is that he *did* believe this evidence because it came from the same sources as did the evidence that J.K. attributed the idea of the accusation to her younger stepsister: Investigator Buster and CPS worker Johnson.

The Court of Appeals erred in concluding that the trial court abused its discretion in disbelieving the complaining witness's recantation.[39] The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

HOLCOMB, J., filed a dissenting opinion in which MEYERS, J., joined part I with note and PRICE, and JOHNSON, JJ., joined.

---

other statement.... In such situations recanting affidavits, other statements and witnesses are viewed with extreme suspicion by the courts."); *see also Wilson,* 445 S.W.2d at 214–216.

38. Judge Holcomb concludes that the credibility of a recanting witness cannot affect the materiality of the recantation. However, this conclusion is contrary to our prior caselaw interpreting the old motion for new trial statute, which contained substantially the same wording now found in Article 40.001. According to that caselaw, whether a recantation is "material" includes a consideration of the victim's credibility in light of the evidence presented. Neither the Court of Appeals nor

appellant has taken the position taken in the dissent that due to the language of Art. 40.001, credibility is not an issue, and that *all* victim recantations require a new trial. Appellant's position, and that of the Court of Appeals, is simply that the trial court abused its discretion in *this* case because the victim's recantation was probably true.

39. Judge Meyers takes us to task for failing to defer to the Court of Appeals's determination. But we are empowered to review cases in which "a court of appeals has so far departed from the accepted and usual course of judicial proceedings ... as to call for an exercise of the Court of Criminal Appeals' power of supervision." *See* Tex.R.App. P. 66.3(f).

HOLCOMB, J., dissenting in which PRICE and JOHNSON, JJ., join.

MEYERS, J., joins part I with a note.

## I

Texas Constitution article V, § 6, provides that "the decision of [the] courts [of appeals] shall be conclusive on all questions of fact brought before them on appeal or error." In *Meraz v. State,* 785 S.W.2d 146 (Tex.Crim.App.1990), and later in *Johnson v. State,* 23 S.W.3d 1 (Tex. Crim.App.2000), we recognized that the Conclusivity Clause means what it says, i.e., the courts of appeals' decisions on factual sufficiency are conclusive. In *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim. App.1996), we recognized the authority and responsibility of the courts of appeals to conduct factual sufficiency reviews, and we set forth the manner in which such reviews are to be conducted. So far we have only applied factual sufficiency review to a limited number of situations. *See, e.g., Meraz,* 785 S.W.2d 146; *Clewis,* 922 S.W.2d 126. I believe we should extend those holdings to this context. Whenever a court of appeals considers a fact-bound question, like a motion for a new trial, its decision should be final. Thus, I would address this case in the following manner.

When considering a motion for new trial based on material evidence, a trial court must determine whether the elements of Texas Code of Criminal Procedure article 40.001 are met. On review, the court of appeals' role is to determine whether the record evidence reasonably supports the trial court's decision.

Here, the court of appeals essentially applied the correct standard of review. After considering all of. the evidence presented at trial and at the new trial hearing, the court of appeals concluded that the trial court abused its discretion, i.e., that the record evidence did not support the trial court's decision. *Keeter v. State,* 43 S.W.3d 667, 676 (Tex.App.-Waco 2001) ("Based on the evidence both at trial and the hearing, we find that the evidence does not support the trial court's finding. . . ."). Because the courts of appeals are the final arbiters of factual issues and the court of appeals below applied the correct standard of review, it is unconstitutional for this Court to conduct its own factual review. Therefore, I respectfully dissent.

## II

Alternatively, I would hold that the majority opinion is unconstitutional for another reason. Texas Code of Criminal Procedure article 40.001 provides that "[a] new trial *shall* be granted an accused where material evidence favorable to the accused has been discovered since trial." (Emphasis added.) The majority, after concluding that the statute is ambiguous, holds that a trial court's decision to deny an Article 40.001 motion based on a recantation should be upheld if there is some basis in the record for disbelieving the recantation.

Because I conclude that: (1) the statute is unambiguous, (2) the test adopted by the majority unconstitutionally[1] amends an unambiguous statute, and (3) under the test supplied by the Legislature, a new trial must be granted where recanted testimony is the sole basis of conviction, I must respectfully dissent.

---

**1.** In *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991), we explained that "[w]hen we interpret statutes ... we seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation. We do so because our state constitution as-

signs the lawmaking function to the Legislature while assigning the law interpreting function to the Judiciary." (Some punctuation omitted). *See also* Tex. Const. art. II, § 1.

A.

On April 10, 2000, appellant, Jackie Russell Keeter, was tried for indecency with a child and aggravated sexual assault. *See* Tex. Pen.Code §§ 21.11 & 22.021. During the guilt/innocence phase of the trial, the State presented evidence that appellant sexually molested his girlfriend's eight-year-old daughter, J.K. The State's entire case consisted of the testimony of three witnesses: J.K., Rhonda King (J.K's stepmother), and Jim Buster (a criminal investigator).[2]

J.K. was the first witness called by the State. She testified that appellant "put his finger into [her] private" and "put his private into [her] private." She further testified that he molested her "almost every day" and that Rhonda King was the first person she informed about the abuse.

Next, the State called Rhonda King to testify. She testified that "[J.K.] told me that [appellant] was touching her and doing things to her that he should not have been doing." More specifically, she testified that J.K. told her that appellant would "put his hand down her panties" and "made her touch him."

Finally, the State called Jim Buster to the stand. He testified that he investigated, in his capacity as a criminal investigator for the Hamilton County Sheriff's Office, an allegation of sexual abuse made by J.K. to Rhonda King. He further testified that he interviewed J.K. and that her ac-

count of the events was "pretty much parallel" to the story that Rhonda King had told him. After Buster finished testifying, the State rested its case.

*In sum, the statements made by J.K. were the only evidence presented by the State.* The State did not present any eyewitnesses, nor did it produce any physical evidence, nor was there any medical testimony.

At the conclusion of the trial, the jury found appellant guilty of indecency with a child and assessed punishment at imprisonment for life.

On May 9, 2000, appellant filed a motion for new trial. In support of his motion, appellant offered a signed affidavit from J.K., wherein she completely recanted her trial testimony.[3] Specifically, she swore that "[she] did not tell the truth about [appellant] touching [her]," that she fabricated the story because she wanted to live with her father during the summer,[4] and that she lied at trial because "[she] was scared to tell the truth after [she] had already told everyone the story."

On May 30, 2000, the trial court held a hearing to consider appellant's motion. At the hearing, Rhonda King and Travis King (J.K's father) testified that (1) they did not believe that appellant was guilty and (2) they did not believe that J.K. testified truthfully at trial.[5] Eva King (J.K.'s mother) also testified to that effect and further

---

2. For a more detailed discussion of the testimony presented by both the State and the defense, see *Keeter v. State*, 43 S.W.3d 667 (Tex.App.Waco 2001).

3. Additionally, appellant offered a signed affidavit from Rhonda King, wherein she stated that she did not believe that J.K. testified truthfully and that J.K changed her story "to [sic] many times."

4. At the time, J.K. was living with her mother and appellant.

5. Additionally, both Travis and Rhonda testified at the hearing that prior to the trial they informed the District Attorney that they did not believe J.K. was telling the truth. Indeed, in his motion for a new trial, appellant argued that the prosecution withheld exculpatory evidence. However, because the Court of Appeals granted relief on the recantation issue, it did not consider appellant's second claim.

testified that, subsequent to the trial, J.K. told her that she lied at the trial.

Next, the State called J.K., who testified, in relevant part, as follows:

Q. And you told the truth last time [at trial], too, didn't you?

A. No, sir.

Q. I'm sorry?

A. No, sir.

\* \* \* \* \* \*

Q. What—what did you not tell us the truth about?

A. About the whole thing.

Q. I am sorry, [J.K.], I just can't hear you, baby. I need you to talk a little louder.

A. About the whole thing.

Q. About what?

A. About the whole thing.

On cross:

Q. [J.K.], when you made that statement two years ago about [appellant] touching you in your private places, was that true?

A. No, sir.

Q. I'm sorry?

A. I mean no, ma'am.

Q. Okay. And when you came to my office you told me that; is that correct?

A. Yes, sir—I mean yes, ma'am.

\* \* \* \* \* \*

Q. And you told me that you—you basically told a lie when you testified when you testified in court; is that right?

A. Yes, ma'am.

Q. And even though the Judge told you to tell the truth, that you lied because you were afraid; is that right?

A. Yes, ma'am.

Q. Because you thought you would get in real trouble if you finally told the real truth, is that right?

A. Yes, ma'am.

Q. And the real truth is that [appellant] never did touch you; is that correct?

A. Yes, ma'am.

Q. Did anybody threaten you to make you say that?

A. No, ma'am.

At the conclusion of the hearing, the trial court denied appellant's motion for a new trial because he did not find the recantation to be credible.[6]

---

**6.** One of the trial court's specific reasons for not believing J.K's recantation was that it "would require [him] to believe that [J.K.] made up her testimony because her sister told her she would have to make something up. . . ." (At the time, J.K.'s younger sister was three years old.) The majority also offers that reason as a basis in the record for disbelieving J.K.'s recantation. Majority opinion at 13. This is, however, much ado about nothing.

First of all, J.K. was a young child herself, and we do not expect everything a young child says to make perfect sense. Secondly, it is by no means clear, when considering her affidavit and the testimony adduced at the hearing, that J.K. even claimed such a thing.

In her affidavit she states, in relevant part, as follows:

"I wanted to stay with my father for the summer in 1998. My little sister, Jennifer, said my mom said I couldn't unless something happened. I decided to make something happen. I had made friends with a girl, and she told me how men make women happy, and about what they do. I decided to tell my dad that [appellant] touched me in my private places. I thought that when my dad took me back to my mom I would tell her that nothing happened, I just wanted to stay with my dad for the summer. But he never took me back, so I couldn't tell her."

"I told a lie in Court because I was scared to tell the truth after I had already told everyone the story, and my step-mom told me if I

On appeal, appellant argued, among other things, that the trial court erred in failing to grant a new trial in light of J.K.'s complete recantation of her testimony at trial. The Tenth Court of Appeals agreed with appellant and held that the trial court abused its discretion in denying the motion for new trial. *Keeter*, 43 S.W.3d 667. In so holding, the Court of Appeals applied the following "test":

> "Motions for new trial based on newly discovered evidence, including recanted testimony, are governed by art. 40.001, which states that 'A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial.' The standard of review for the denial of a motion for a new trial is abuse of discretion, *i.e.*, whether the denial was arbitrary or unreasonable. The trial court is arbitrary or unreasonable in denying the motion if the record reflects: (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence is probably true and would probably bring about a different result in another trial. In cases where a witness has testified to material inculpatory facts against an accused and after verdict, and before motion for new trial has been acted on, such witness makes affidavit that he testified falsely, the general rule is that the new evidence is probably true and a new trial should be granted. An exception to the general rule occurs when the trial court finds the recantation to not be credible based on the trial evidence and the evidence at a hearing on the motion. 'Credibility' is measured by whether the recantation is 'probably true.' " *Id.* at 673–674 (citations and some punctuation omitted).

The Tenth Court held that "the evidence [presented at the trial and at the hearing] does not support the trial court's finding that J.K.'s recantation was not credible." *Id.* at 676.

We granted the State's petition for discretionary review to determine whether the Court of Appeals erred. *See* Tex. R.App. Proc. 66.3. In its brief to this Court, the State argues that the Court of Appeals erred in failing to give almost total deference to the trial court's ruling. In support of its argument, the State cites *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim.App.2000), and *Guzman v. State*, 955 S.W.2d 85, 86 (Tex.Crim.App.1997).

The majority adopts the "test" set forth by the Court of Appeals, but the majority adds a wrinkle. The last line in the Court of Appeals' test provides that "[c]redibility is measured by whether the recantation is probably true." The majority then, in essence, adds one more line: A recantation is *not* "probably true" if there is some basis in the record for disbelieving the

---

lied, I would go to juvenile hall. I thought if I told the truth, everyone would know I lied before, and I would be in trouble. I waited until my dad took me back to my mom last week, and told her the truth then. I didn't know [appellant] would get into trouble."

Her statement about her little sister (and her testimony at the hearing concerning her little sister) is ambiguous at best. Moreover, at the hearing, J.K. specifically states that it was her best friend, not her little sister, who told her what to say.

Finally, even if J.K. claimed that her three-year old sister told her to make-up the story, it does not matter. As the majority correctly notes, such a claim would bear upon the credibility of J.K. Credibility, however, is not part of the test supplied by the Legislature. *See discussion infra.*

recantation. *See* majority opinion at 10–11.

However, neither the test proposed by the State, nor the one set forth by the Court of Appeals and expanded upon by the majority, is appropriate when analyzing a motion for a new trial based on material evidence.

### B.

"Where [a] statute is clear and unambiguous, the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute." *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991). Texas Code of Criminal Procedure article 40.001 provides that "[a] new trial *shall* be granted an accused where material evidence favorable to the accused has been discovered since trial." (Emphasis added.) These words are crystal clear. There is no doubt as to their meaning, and thus, no need to consider extratextual factors. Under the test supplied by the Legislature, if a convicted person can show three elements—(1) there is material evidence, (2) it is favorable, and (3) it has been discovered since trial—the trial court *must* grant the motion for a new trial. The trial court's role in such an instance is merely to determine whether the three elements are met. On review, the court of appeals' only role is to consider whether the trial court abused its discretion, i.e., whether a reasonable trial judge could have concluded that the three elements were or were not met. It is as simple as that. There is no ambiguity, and there is no credibility requirement.

The majority, however, concludes that, because the language of Article 40.001 is "ambiguous," it is necessary to look to extratextual factors in determining the statute's meaning. In addition, the majority concludes that since Article 40.001 is substantially similar to a previous statute, Article 40.03, we should interpret Article 40.001 in conformity with the caselaw that interpreted Article 40.03. I disagree with both of those conclusions.

First of all, the statute and the key word therein ("material") are not ambiguous. "Material" simply means "important." Black's Law Dictionary defines "material" as "important." *Black's Law Dictionary* 747 (6th ed.1990); *see also Ballentine's Law Dictionary* 781 (3rd ed.1969) (defining "material" as "important"). Similarly, Webster's Ninth New Collegiate Dictionary defines "material" as "having real importance or great consequences." *Webster's Ninth New Collegiate Dictionary* 733 (9th ed.1988); *see also The Compact Edition of the Oxford English Dictionary* 1742 (1971) (defining "material" as "of serious or substantial import, of much consequence; important."). In support of its conclusion that the statute is ambiguous, the majority cites the United States Supreme Court's decision in *U.S. v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In that decision, however, a majority of the Supreme Court does not conclude that the word material is ambiguous. It held that nondisclosed evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 682, 105 S.Ct. 3375; *accord Ex parte Brandley,* 781 S.W.2d 886, 893 (Tex.Crim. App.1989). That is merely another way of saying that material evidence means important evidence. If the result of the proceeding would have been different had the evidence been disclosed, then such evidence is obviously important.

Secondly, our caselaw interpreting Article 40.03 was implicitly overruled by *Boy-*

*kin,* and thus, we *cannot* constitutionally [7] interpret Article 40.001 in conformity with our caselaw that interpreted old Article 40.03. Old Article 40.03 provided that "[n]ew trials, in cases of felony, shall be granted the defendant ... [w]here new evidence material to the defendant has been discovered since the trial." Those words were clear and unambiguous. The article set forth a two part test: a trial court shall grant a new trial based on new evidence if (1) the evidence is material and (2) the evidence was discovered since trial. The majority correctly notes that "[w]e consistently interpreted [article 40.03(6)] as requiring the satisfaction of a four part test." [8] *See* majority opinion at 8–9. The last prong of that test contains the requirement that the evidence be "probably true," which we further interpreted to mean that such evidence be "credible." *See Jones v. State,* 711 S.W.2d 35, 36–37 (Tex.Crim.App.1986).

But, because Article 40.03 was clear and unambiguous, we were obliged to give effect to its plain meaning, and we were not free to add to or subtract from it. *Boykin,* 818 S.W.2d at 785. Article 40.03 did not contain any diligence requirement, any "probably true" requirement, nor did it contain any requirement that the evidence be credible. Thus, to the extent that those cases held otherwise, they were implicitly overruled by *Boykin.*

Similarly, Article 40.001 is clear and unambiguous. Hence, there is no need to consider extratextual factors, *i.e.,* there is no need to interpret Article 40.001 "in conformity with our prior caselaw and continue to adhere to the four-part test." In doing so, the majority essentially adds a credibility requirement to the test supplied by the Legislature. But credibility is not part of the test. Article 40.001 does not contain any requirement that new material evidence must be "probably true" or that it must be credible. Perhaps it should.[9] But it does not. If a statute is clear on its face, as this one is, we must follow it. *Boykin,* 818 S.W.2d at 785. We are not free to add to or subtract from a statute

---

7. *See infra* note one.

8. The four-part test is whether (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence is probably true and would probably bring about a different result in another trial. *Ayers v. State,* 606 S.W.2d 936, 941 (Tex.Crim.App.1980).

9. *But see Green v. State,* 94 Tex.Crim. 637, 252 S.W. 499 (App.1923) (opinion on rehearing) ("It seems to us that the reason for granting a new trial in such case goes deeper and rests on the proposition that a citizen should not be punished or deprived of his life or liberty upon the testimony of one whose veracity is thus shown to be wanting."); Harris L. Beach, Jr., *Recanted Testimony: The Red-headed Stepchild of Criminal Trial Practice,* 8 S. Carolina Lawyer 40, 43 (1997):

"Other states' courts have granted a new trial when the recanted testimony comes from the sole prosecuting witness and the remaining evidence, alone, is not adequate to uphold a conviction. Some of these courts have held that it is an abuse of discretion not to grant a new trial in such a situation and that *the issue of the witness' credibility should be left to a jury. Bussey v. State,* 69 Ark. 545, 64 S.W. 268 (1901); *People v. Smallwood,* 306 Mich. 49, 10 N.W.2d 303 (1943); *Commonwealth v. Mosteller,* 446 Pa. 83, 284 A.2d 786 (1971); *State v. York,* 41 Wash.App. 538, 704 P.2d 1252 (1985); *Myers v. State,* 111 Ark. 399, 163 S.W. 1177 (1914); *Robinett v. State,* 494 So.2d 952 (Ala.Cr.App.1986); *Solis v. State,* 262 So.2d 9 (Fla.App.1972); *State v. Rolax,* 84 Wash.2d 836, 529 P.2d 1078 (1974). (All of these cases resulted in a new trial because the recanted testimony was the only evidence of guilt.)." (Emphasis added).

just because we do not agree with it. *Id.*[10]

Furthermore, the test adopted by the majority is unworkable and makes little sense. The test begins with the "general rule" that "where a witness has testified to material inculpatory facts against an accused and after verdict, and before motion for new trial has been acted upon, such witness makes affidavit that he testified falsely, a new trial should be granted." Majority opinion at 10; quoting *Williams v. State*, 375 S.W.2d 449, 451 (Tex.Crim. App.1964). That sounds clear enough. But, the test then goes on to provide that a trial court does not abuse its discretion in denying a motion for a new trial based on a recantation of incriminating testimony if there is some basis in the record for disbelieving the recantation. The problem with such a test is that there will always be some basis in the record for disbelieving a recanting witness. The mere fact that the witness is recanting provides some basis for disbelief. Hence, under the test provided by the majority, a defendant who loses in the trial court can never succeed on appeal.[11] Thus, the "test" is not a test at all.[12]

## C.

In determining whether the Court of Appeals erred, I would review their decision in light of the test set forth by the Legislature in Article 40.001. Under that test, if a convicted person can show three elements—(1) there is material evidence, (2) it is favorable, and (3) it has been discovered since trial—the trial court *must* grant the motion for a new trial. On review, the court of appeals' only role is to consider whether the trial court abused its discretion, *i.e.*, whether a reasonable trial judge could have concluded that the three elements were or were not met.

Based on the evidence presented in this case, a reasonable trial judge would necessarily have concluded that appellant satisfied the three elements in Article 40.001. The evidence was discovered since trial, as J.K. recanted shortly after the trial concluded. The recantation was clearly favorable evidence, as J.K. now claimed that appellant did not abuse her. Finally, the recantation was material evidence. In this case, the *only* evidence presented was J.K.'s statements. Without her statements there is no evidence to support ap-

---

10. *Cf. Cuellar v. State*, 70 S.W.3d 815 (Tex. Crim.App.,2002) (where statute provided only two listed exceptions, only the Legislature could add other exceptions); *Tyra v. State*, 897 S.W.2d 796, 799 (Tex.Crim.App.1995) (even though application of clear statute "seems unwise or unfair," we must follow the law as it is actually written).

11. *Cf.* Janice J. Repka, Comment, *Rethinking the Standard for New Trial Motions Based Upon Recantations As Newly Discovered Evidence* 134 U.Pa.L.Rev. 1433, 1445 (1986):

> "[W]hile the courts indulge the strong presumption that all recantations are somehow tainted, they do not articulate clearly how a defendant may rebut this presumption. Such a presumption may not be rebuttable at all in many factual situations in which the conviction is based mainly on the re-

canting witness's original trial testimony without substantial corroborating evidence. For example, a court may refuse to believe the recantation of a rape victim, yet what more could a defendant do than to have the victim swear she made up the crime?" (Footnotes and some punctuation omitted)

12. In fact, except for the Court of Appeals below, all the Courts of Appeal in Texas who have considered this issue, under article 40.001, have found there was no abuse of discretion. *See, e.g., Quinton v. State*, 56 S.W.3d 633 (Tex.App.Waco 2001) (even though witness recanted, trial court did not abuse its discretion in denying the motion for new trial); *Monse v. State*, 990 S.W.2d 315 (Tex.App.-Corpus Christi 1999) (same); *Ashcraft v. State*, 918 S.W.2d 648 (Tex.App.-Waco 1996) (same); *Driggers v. State*, 940 S.W.2d 699 (Tex.App.-Texarkana 1996) (same).

pellant's conviction.[13] In such an instance, where recanted testimony is the sole basis for the conviction, the recantation is always material (*i.e.* important) and, thus, it is an abuse of discretion not to grant the motion for a new trial. *Green v. State*, 94 Tex.Crim. 637, 252 S.W. 499 (App.1923) (opinion on original submission) ("[W]hen the State is compelled to rely for its conviction upon the testimony of a witness who afterward and before the motion for new trial is acted upon, retracts the truth of said testimony and himself appears before the court and under oath affirms that the testimony as given by him originally was not true, and when the facts show that without such testimony the State has no case, the conviction should be set aside."); *accord Robinett v. State*, 494 So.2d 952, 955 (Ala.Crim.App.1986) ("[W]hen a defendant is convicted solely on the testimony of the now recanting witness, it would be an abuse of discretion not to allow a new trial."); *State v. Rolax*, 84 Wash.2d 836, 529 P.2d 1078, 1079 (1974) ("When a defendant is convicted solely on the testimony of the now recanting witness, this court has squarely held that it is an abuse of discretion not to grant a new trial."); *Commonwealth v. Mosteller*, 446 Pa. 83, 284 A.2d 786, 788 (1971) (Where recanting witness "gave the *only* testimony which could possibly have led to appellant's conviction," "it was a clear abuse of discretion not to award a new trial under these circumstances and thereby allow a new jury to pass on the child prosecutrix's credibility."). This Court's predecessor recognized this very same principle in *Mann v. State*, 44 Tex. 642 (1876). There the Texas Supreme Court held that where the main prosecuting witness recanted, "the guilt of the appellant was left too uncertain . . . to

justify the court in refusing him another trial." *Id* at 644. The only difference between the present case and *Mann* is that in *Mann* there was at least some other evidence. Here, there is none. Therefore, appellant is entitled to new trial.

On the other hand, if there is sufficient evidence to support the conviction without the recanted testimony, then it is reasonable to conclude that the recantation is not material. However, if there is no other evidence to support the conviction, then the recantation is necessarily material, i.e., important. Why? Because it undermines our confidence in the outcome of the proceeding. We are left wondering whether the witness was lying at trial or is lying now. In such an instance, a jury should be allowed to determine credibility.

The court of appeals correctly concluded that the trial court abused its discretion in not granting the motion for new trial. Accordingly, I would affirm the judgment of the court of appeals.

MEYERS, J., dissents with a note:

I join in Part I of Judge Holcomb's dissenting opinion. I would leave the decision of the Court of Appeals undisturbed. In this case, the Court of Appeals determined that the trial court abused its discretion by denying appellant's motion for new trial. Although I agree with majority that we owe deference to the trial court's ruling on such a motion, I disagree that this relieves us of the deference we our intermediate appellate courts. To overrule the Court of Appeals in a case such as this, in which the court properly applied the law to the facts, is to obviate the need

---

**13.** In most of the cases cited in note twelve, there was at least some other additional evidence to support the conviction. *See Quinton,* 56 S.W.3d at 639 (there was some medi-

cal evidence); *Monse,* 990 S.W.2d at 318 (defendant's confession was sufficient to support his conviction); *Ashcraft,* 918 S.W.2d 648 (there was some medical evidence).

for the Court of Appeals to rule at all. Because I believe this Court should not sit as the Fifteenth Court of Appeals, I dissent.